OPINION
{¶ 1} Appellant Susanne Hull appeals from the June 23, 2003, Judgment Entry of the Stark County Court of Common Pleas, Family Court Division, terminating appellant's parental rights and granting permanent custody of appellant's two minor children to the Stark County Department of Jobs and Family Services.
 STATEMENT OF THE FACTS AND CASE {¶ 2} Appellant is the biological mother of two minor children, namely, Mikayla Hull (DOB 1/20/95) and Reily Hull (DOB 2/11/98).
 {¶ 3} On October 19, 2001, the Stark County Department of Jobs and Family Services (SCDJFS) filed a complaint alleging that the two children were dependent and neglected children. Pursuant to a Judgment Entry filed on the same day, the children were placed in the temporary custody of SCDJFS. At a hearing held on January 14, 2002, appellant stipulated to a finding of dependency and allegations of neglect were, upon SCDJFS' motion, deleted from the complaint. Temporary custody was granted to SCDJFS and the two children were placed in the home of their paternal grandparents, Randy and Christine Hull.
 {¶ 4} Thereafter, on September 12, 2002, SCDJFS filed a motion seeking permanent custody of the children. A hearing on such motion was held on November 13, 2002. As memorialized in a Judgment Entry filed on November 20, 2002, the trial court denied the motion, finding that "it is in the children's best interest to afford the parents some additional time to satisfactorily complete the case plan for reunification which this Court has previously adopted."
 {¶ 5} On March 20, 2003, SCDJFS filed another Motion for Permanent Custody. SCDJFS, in its motion, alleged in part, as follows:
 {¶ 6} "The case plan adopted by the Court required Mother to complete a psychological evaluation, which she accomplished. The psychological evaluation recommended Mother participate in individual and joint counseling and address her substance abuse problem. The case plan for Mother also required her to attend Quest Recovery Services. Mother was convicted pursuant to Case Number 2001-CR-1215 for possessing illegal drug documents. She violated her conditions of parole for failing to comply with Quest and as a result was sentenced to prison, thus failing to substantially comply with her case plan. Mother has not visited since October of 2002. Prior to incarceration her visitation was sporadic causing negative effects on the children. . . .
 {¶ 7} The following testimony was adduced at the hearing, which commenced on May 27, 2003, and was completed on June 4, 2003.
 {¶ 8} Shawn Scott, a SCDJFS family service worker who is assigned to the Hull children, testified that appellant's case plan required her to complete a psychological evaluation, obtain an assessment for substance abuse from Quest Recovery Services and follow all recommendations, submit to random urinalysis, and to participate in individual therapy and joint counseling with the children. Scott testified that appellant did go to Human Development for a psychological evaluation, but that appellant had "not completed individual [counseling] or followed through with the joint counseling with the children." Transcript of May 27, 2003, hearing at 11. According to Scott, appellant failed to comply with treatment at Quest and was incarcerated as a result.[1] When asked, Scott testified that she has not been able to verify that appellant had "successfully mitigated" the "substance abuse concerns" which were adopted and approved by the trial court. Transcript of May 27, 2003, hearing at 12. At the time of the hearing, appellant was incarcerated in federal prison in Louisiana facing deportation to Ireland, her native country, by the Immigration and Naturalization Service. Scott testified that appellant was, at the time of the hearing, unable to care for her children and that appellant was not able to give to Scott a definitive release date, although appellant did tell Scott that there was a hearing on June 11, 2003.
 {¶ 9} The following testimony was adduced when Scott was asked about appellant's contact with her children during periods when appellant was not incarcerated:
 {¶ 10} "A. That's been infrequent as well. Visits and the phone contact.
 {¶ 11} "Q. Okay. And when you say — can you give the Court a basic understanding of how many months it has been during the pendency of this case that mother has not been incarcerated?
 {¶ 12} "A. She was not incarcerated through November through I believe, March or April of 2001.
 {¶ 13} "Q. So that's about four or five months?
 {¶ 14} "A. Yes.
 {¶ 15} "Q. And how did she do with contact during that period?
 {¶ 16} "A. Missed several visits when the grandparents were supervising the visits and then it was infrequent when I began to supervise the visits, as well. She was then incarcerated through, I believe, November — I'm sorry, August of 2001, so there was about two months when she was not incarcerated in that time, there were visits and thnose [sic] were infrequent as well. She cancelled and missed visits." Transcript of May 27, 2002, hearing at 19-20. Scott further testified that she believed appellant had not successfully remedied the problems that led to the initial removal of the children and that she was satisfied with the care the children were receiving from their paternal grandparents.
 {¶ 17} Susan Deibel, an outpatient therapist who is employed by Family Services and who is a licensed professional clinical counselor, testified that, as a result of her initial assessment of Mikayla in December of 2001, she diagnosed her with separation anxiety disorder, enuresis (incontinence), and neglect. Deibel testified that she did not believe that there was a biological component to the enuresis and that Mikayla suffered from a lack of stability in her life. According to Deibel, Mikayla's "history up until that point had been chaotic with her biological parents things were very uncertain, she did not know from one minute to the next where she was going to be staying, what was going to be happening." Transcript of May 27, 2003, hearing at 66. Diebel testified that, as a result, Mikayla "is constantly worried that something bad will happen." Id. Deibel also testified that Mikayla showed signs of neglect since her hair was not clean and her baby teeth seemed to be rotting. According to Deibel, these problems had existed prior to the time that Mikayla was removed from her biological parents' custody.
 {¶ 18} At the hearing, Christine Hull, the childrens' paternal grandmother, testified that the two children had been residing with her since October of 2001 and that when the children first arrived at her home, Mikayla "was going through a stage where she thought she was the mother of Riley, she . . . got to the point where she wanted to boss me and my husband around because she was so used to being in charge and taking care of Riley and Riley relied upon Mikala for everything, it was a real close relationship between the two." Transcript of June 4, 2003, hearing at 6. Hull testified that, during the time from October of 2001 to the end of December, 25, 2001, visits between the two children and their parents were scheduled, but that appellant and her husband, Hull's son, only showed up around ten times. When asked how the visits went, Hull responded as follows:" Mom [appellant] would go off to another room even though she was told to stay in our presence so we could hear what was going on, she was making promises to the girls that she was unsure of and she kept sneaking off with them." Transcript of June 4, 2003, hearing at 7-8. During one of the visits, the police had to be called to the home. Hull testified as follows when questioned about such visits:
 {¶ 19} "There was — I'm not sure of the circumstances, they [appellant and her husband] were out back and they were told they weren't supposed to be away from us when they were seeing the girls and we asked them to leave and Mike [appellant's husband] lost his temper and Susanne [appellant] lost her temper and telling the girls that they were going to take `em, get `em back and that they wouldn't see us again and we called the police. Susanne was taken in that day because she wouldn't sit down and be quiet for the police officer, and Michael, he — I don't know what happened, he was at the end of the driveway and busted up the mailbox and because it wasn't seen by the police officer he —" Transcript of June 4, 2003, hearing at 22. According to Hull, after the visits, for a couple of days, the two children "They didn't want to listen to our rules, they wanted to go back to doing as they pleased, no supervision, they thought they could do just whatever they wanted and Mikayla, she was confused, she didn't know, she would have stomach aches quite often." Transcript of June 4, 2003, hearing at 8. Hull testified that, from December until the time of the hearing, the childrens' behavior had improved and that both children were seeing a therapist.
 {¶ 20} Reba Price-Swartz, a professional clinical counselor with Northeast Ohio Behavioral Health, testified at the hearing that she has counseled Mikayla, who she believed exhibited symptoms of adjustment disorder with anxiety and depression, to become "less parentified and more obedient with the grandparents." Transcript of June 4, 2003, hearing at 30. Price-Swartz testified that reintegration of appellant into the childrens' lives is not an aspect or component of her therapy since appellant "had demonstrated that she was unable to provide consistent and stable housing for her children." Transcript of June 4, 2003, hearing at 30. Price-Swartz testified that appellant admitted to relapsing in the use of alcohol and was in and out of jail. According to Price-Swartz, "increased emotional stress" would result if she had attempted to reintegrate appellant into the childrens' lives. Transcript of June 4, 2003, hearing at 31. Price-Swartz also testified that Mikayla had indicated that she did not wish to speak with her mother. Price-Swartz testified that it would be in Mikayla's best interest to be with her grandparents. In so opining, Price-Swartz testified as follows:
 {¶ 21} ". . . the last two weeks Mikayla has been very distressed and very worried that the courts will not rule permanent custody and her grandparents will not be allowed to adopt her and that she will go back into the environment that she was raised in with her mother and her father, in other words, multiple moves from one home to another, changes in schools and friends, she wants that stability and that security and she wants to go to school, she has begun making friends. She comes into sessions and tells me about her girlfriends and her boyfriends and going to parties, very healthy age appropriate things now. I did not hear, I heard very little of that when I began counseling with Mikayla." Transcript of June 4, 2003, hearing at 44-45.
 {¶ 22} At the best interest hearing, Shawn Scott testified that Mikayla does not have any severe or any physical development delays, but that she has emotional or mental development delays. Scott further testified that Reily has no physical or emotional development delays and that both children are on target academically and doing well in school. Scott testified that she believed it would be in the childrens' best interest if permanent custody were granted to SCDJFS. In addition, Christine Hull testified that she and her husband were willing to adopt the two children and were financially able to do so.
 {¶ 23} The Guardian ad Litem, in her May 27, 2003, report, recommended that permanent custody of Mikayla and Reily be granted to their paternal grandparents. The Guardian Ad Litem noted that while appellant and her husband were unable to provide for the childrens' needs because of their drug and legal problems, the grandparents had "responded to their needs in time of crisis, . . ."
 {¶ 24} Following the hearing, as memorialized in a Judgment Entry filed on June 23, 2003, the trial court terminated appellant's parental rights and granted permanent custody of appellant's two minor children to SCDJFS. The trial court, in its entry, found that Mikayla and Reily could not and should not be placed with either parent within a reasonable period of time and that it was in their best interest that permanent custody be granted to SCDJFS.
 {¶ 25} It is from the trial court's June 23, 2003, Judgment Entry that appellant now appeals, raising the following assignments of error:
 {¶ 26} "I. The Judgment Of The Trial Court That The Minor Child Cannot Or Should Not Be Placed With Appellant Within A Reasonable Time Was Against The Manifest Weight And Sufficiency Of The Evidence.
 {¶ 27} "II. The Judgment Of The Trial Court That The Best Interests Of The Minor Child Would Be Served By The Granting Of Permanent Custody Was Against The Manifest Weight And Sufficiency Of The Evidence."
 I, II {¶ 28} Appellant, in her two assignments of error, argues that the trial court's findings that the children could not or should not be placed with appellant within a reasonable time and that the grant of permanent custody was in the childrens' best interest were against the manifest weight and sufficiency of the evidence. We disagree.
 {¶ 29} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base its judgment. Cross Truck v. Jeffries (Feb. 10, 1982), Stark App. No. CA-5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. (1978), 54 Ohio St.2d 279,376 N.E.2d 578.
 {¶ 30} R.C. 2151.414(B)(1) addresses under what circumstances a trial court may grant permanent custody. Such statute provides as follows:
 {¶ 31} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 32} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 33} "(b) The child is abandoned.
 {¶ 34} "(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
 {¶ 35} "(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999."
 {¶ 36} In the case sub judice, the trial court found, in its June 23, 2002, findings of fact, that the children had been in the temporary custody of SCDJFS for 12 or more of the past consecutive 22 months and that the children cannot and should not be placed with appellant in a reasonable time. Those findings are alternate findings under R.C.2151.414(B)(1). (R.C. 2151.414(B)(1)(d) and (a) respectively) Either of those findings, if supported by the evidence, would have been sufficient in and of itself to base a grant of permanent custody pursuant to R.C.2151.414(B)(1).
 {¶ 37} Appellant does not appeal the trial court's finding that the children were in the temporary custody of SCDJFS for 12 or more of the past consecutive 22 months. Such a finding is enough to satisfy the requirements of R.C. 2151.414(B)(1). See In re: Whipple Children, Stark App. No. 2002CA00406, 2003-Ohio-1101. However, because the trial court made a finding that the children should not or cannot be placed with appellant in a reasonable time this court shall review that finding.
 {¶ 38} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:
 {¶ 39} "(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section2151.353 * * * of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 * * * of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:
 {¶ 40} "(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties."
 {¶ 41} As is stated above, testimony was adduced at the permanent custody hearing that appellant had failed to attend individual and joint counseling as required by her case plan and that appellant failed to complete required substance abuse programs through Quest Recovery Services. In addition, testimony was adduced that appellant, as the trial court noted, had repeated incarcerations that prevented her from being able to care for her children. Based on the foregoing, we find that there was clear and convincing evidence supporting the trial court's finding that the two children could not or should not be placed with appellant within a reasonable time.
 {¶ 42} Appellant also contends that the trial court erred when it found that permanent custody was in the best interest of the children. In determining the best interest of a child, the trial court is required to consider the factors contained in R.C. 2151.414(D). These factors are as follows:
 {¶ 43} "(1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care givers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 44} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 45} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 46} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 47} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child."
 {¶ 48} In the case sub judice, testimony was adduced that the two children had been in the temporary custody of SCDJFS since October 19, 2001. Testimony was also adduced that the paternal grandparents were interested in adopting the two children and that the children were doing well under their care and were bonded with each other and their grandparents. The Guardian ad Litem, in her report, noted that the grandparents maintained a "safe, secure and loving home" for the two children.
 {¶ 49} Further, testimony was adduced that appellant frequently did not visit with her children when given the opportunity to do so. At the hearing, the childrens' therapist, Reba Price-Swartz, testified that Mikayla, the older of the two children, did not wish to speak with her mother and that re-integration of appellant would cause "increased emotional stress to Mikayla." Price-Swartz further indicated that Mikayla's symptoms of anxiety and depression were stress related.
 {¶ 50} Based on the foregoing, we find that the trial court's findings that the children could not or should not be placed with appellant within a reasonable time and that the grant of permanent custody was in the childrens' best interest were not against the manifest weight and sufficiency of the evidence. There was competent, credible evidence supporting the trial court's decision granting permanent custody of the children to SCDJFS.
 {¶ 51} Appellant's two assignments of error are, therefore, overruled.
 {¶ 52} Accordingly, the judgment of the Stark County Court of Common Pleas, Family Court Division, is affirmed.
By: Edwards, J., Hoffman, P.J. and Boggins, J. concur
[1] Compliance with Quest was a condition of appellant's parole as well as a case plan requirement.